IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXPORTADORA ACONCAGUA, LTDA,<br><br>    vs.<br><br>HERITAGE PRODUCE SALES, INC.,<br><br>    Defendant.<br>_____/<br>AND RELATED CROSS-ACTION.<br>_____/ | CASE NO. CV-F-03-5472 LJO<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW; DECISION** |

## A.  TRIAL

The above-captioned matter came on regularly for Court Trial, after a stipulation to waive a trial by jury.  The matter was tried over four days, commencing on June 14, 2005, and ending on June 17, 2005.  Both Counsel requested that they be allowed to submit post trial briefs on limited issues.  The requests were granted. The briefs, one from each side, were received and reviewed.  The court deemed the case to be under submission for decision at the end of the day on June 27, 2005.

## B.  JURISDICTION AND VENUE

The Court has jurisdiction pursuant to  28 U.S.C. sections 1331 and 1332; also 7 U.S.C. section 499(e).  Venue is proper pursuant to 28 U.S.C. section 1391(a).

## C.  ATTORNEYS AND PARTIES

The Plaintiff and Cross Defendant, Exportadora Aconcagua LTDA, was represented by Counsel Craig A. Stokes of Rojas, Santos, Stokes and Garcia.  The Defendant and Cross Complainant, Heritage Produce Sales, Inc, was represented by Joseph A. Uremovic of the law offices of Joseph A. Uremovic.

**D. LEGAL CLAIMS**

Plaintiff claims liability and damages against Defendant pursuant to the Perishable Agricultural Commodities Act (7 U.S.C. 499a et. seq.)(PACA), and the California Food and Agricultural Code (sections 56283 and 56620).

Defendant makes claims on the cross action for breach of contract, fraud, negligent misrepresentation, and conversion (of a vehicle).

**E. TRIAL WITNESSES**

The following witnesses testified: Gary Austin (President of Heritage Produce Sales, Inc.), Juan Pablo Lopez (Commercial Manager for Exportadora Aconcagua, LTDA), Alejandro Barros (General Manager for Exportadora Aconcagua, LTDA), John Akers (former salesman for Heritage), George Gepp (Liability expert, Chilean Importer retained by the Plaintiff), Dr. Paul Teague (Damages expert, Produce Broker/Shipper retained by the Plaintiff), Shani Hibbard (custodian of records for Pandol Brothers Company), Byron White (Defense expert, ex-employee of USDA), and Jesse Martin (owner of Value Produce and Value Cold Storage). Several of the witnesses were called to the stand more than once.

**F. SYNOPSIS OF FACTS**

From February through May of 2002, Plaintiff Exportadora Aconcagua LTDA, also referred to in pleadings and testimony as "Aconex," shipped grapes in question from Chile to the United States. Defendant Heritage Produce Sales, Inc. received these grapes at the port in Los Angeles. The grapes were shipped on a consignment basis, received by Heritage, and either sold by Heritage or disposed of by Heritage (i.e. "Dumped"). The transaction constituted an international commerce activity.

There was agreement during testimony by witnesses for the parties that the market demand for Flame Seedless 70 grapes from Chile declined substantially by the end of March, 2002. The plaintiff claims that the defendant waited too long to sell the grapes,

resulting in damaged grapes and lost profits.

The defendant claims that many of the grape shipments were of marginal to poor quality, and that they were timely and reasonable in their attempt to sell the grapes. In their capacity as a Cross-Complainant, Heritage claims that they have overpaid the cross-defendant Exportadora on advances, that Exportadora had fraudulently set up the marketing scenario because it knew that the grapes were of inferior quality, they didn't want the inferior grapes to go to their prized customer, Pandol Brothers, and as a result of all of this, Defendant Heritage lost customers. Furthermore, the defendant claims that the cross-defendant has a pickup truck in Chile that belongs to Heritage, and Exportadora will not return it to its lawful and rightful owner, Heritage.

**G.  FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. Any agreement upon which the cross claims are based between the parties was oral in nature. Although there is mention in the Pre Trial Order of a contract as it pertains to the Food and Agricultural Code of California, the code is worded in terms of negligence, and not contract.

2. In spite of the inconsistency on the issue of ownership between the testimony and the language in the Bill of Lading, there appears to be no dispute between the parties that the exporter (Exportadora) retained ownership of the grapes until sold or disposed of by the receiver (Heritage).

3. The words of the Plaintiff's agent, Juan Pablo Munoz, found in Joint Exhibit 18, are of crucial importance to both sides to this case, to wit: "...About this fruit, we need definitively you keep the price on the high edge of the market, that means nothing below (at the lowest) US$ 12.00". Because there was no agreement to the contrary, and because the Plaintiff maintained ownership of the goods, (i.e. Heritage had control and not

ownership) the Plaintiff was well within its right to dictate what the receiver could and could not do with that received merchandise. The Plaintiff exercised that right when it told the receiver defendant not to sell the fruit below the $12 figure. In spite of the testimony of Plaintiff Expert George Gepp to the contrary, which this Court finds not to be credible, the receiver had no right to ignore such a mandate. The more convincing testimony was that of Plaintiff's expert Paul Teague wherein he testified that if an exporter told him to sell a product for a certain price, he would confront the exporter to make certain the exporter understood that it would be done at his own risk. Dr. Teague believed that this was the reasonable and prudent way to take care of the problem. When Dr. Teague was confronted with JX 20, and the question within that document "Are you comfortable with us holding the 70s for a higher price?", Dr. Teague was visibly surprised when he was asked to assume that there was never a response by the Plaintiff to that question. (No evidence was presented that the question was ever answered).

  A. Mr. Gepp was an aggressive advocate and was not an objective expert. It diminished his credibility greatly.

  B. Dr. Teague was a strong and objective expert witness who was willing to concede points even when those points did not benefit the party that retained him. This added to his credibility.

4. In light of the mandate found in Joint Exhibit 18, it is disingenuous for the Plaintiff now to criticize the Defendant for following that order, at least following the order for a time, until the Defendant made an alternate and subsequent decision as a result of poor communication between the two sides.

5. The mandate found in Joint Exhibit 18 had, as its origin, information given to the Plaintiff by the Defendant concerning the condition of the fruit and the information about the market for that fruit. It is without question that the defendant owed the plaintiff a duty to sell the grapes in a reasonably timely manner upon receipt of the grapes. Based on the

1 language of the Defendant's agent, John Akers, in emails (Exhibit numbers 18, 19, 20 and
2 21), it should have been clear to the Plaintiff that there was an in-progress attempt to
3 analyze and speculate on what the market would do in coming days and weeks. If that
4 were not the case, the business of the Defendant would be mechanical in nature: to
5 receive the grapes, and move them that day, no matter what the market price was for that
6 day. Nobody testified that this mechanical scenario was what the Defendant was
7 expected to follow, including the Plaintiff's agent himself in the language found in Joint
8 Ex. 18. The language in the email from John Akers to Juan Pablo Munoz (Joint Ex. 21)
9 is a concise statement of this business circumstance: "You told us to not sell the Flames
10 for less than $12.00. We were in complete agreement with you on this matter. In
11 retrospect we should have sold them when they first arrived. It is always easier to judge
12 a decision when looking back."

13

14 6. Plaintiff's liability expert, George Gepp, testified that when there is a specific price
15 set by an exporter, Mr. Gepp would be sure to "make them put it in writing" so that the
16 exporter would "assume liability." (This appears to be in contradiction to his earlier
17 testimony that he had the right to handle the fruit the way he saw fit). Although not
18 because the defendant Heritage ever demanded it, the Plaintiff indeed nonetheless put
19 their position in writing, and it is to be found in JX 18.

20

21 7. The fact that the Defendant lost the accounts of Albertson's and Von's is as a direct
22 result of an assumption made and a risk taken by Mr. Gary Austin of Heritage. He so
23 much as admitted this on the witness stand. Specifically, he decided not to inspect the
24 grapes going to those two customers before they were sent. When the quality was poor,
25 it affected the business relationship. If the plaintiff shared any blame for sending poor
26 quality grapes to Heritage, the causation was superceded by Heritage's decision to sell
27 and deliver the grapes without first inspecting them.

28

5

8. The gross (P's Ex #8) and net damages issues testified to by Dr. Paul Teague have as their core assumption that the grapes (all the grapes) were U.S. #1 grade. The evidence is clear to this court that this assumption is not correct. Some of the grapes were not U.S. #1 grade. There was ample testimony to the contrary, including the now-relevant testimony concerning Pandol grape conditions (see finding #15) Thus the Court is left with only speculation on the Plaintiff's true damages.

9. Dr. Teague was credible when he testified that it was his opinion that if a product is sold for $11, and if once the product is received by the buyer, there is a complaint about the product's condition and the option is to either accept $5 or pick up the product, the prudent thing to do is to accept the $5. This would be considered to be the "adjusted" price.

10. There is uncontradicted evidence that the Plaintiff is improperly holding the defendant's truck in Chile (I.e. converted it to their own use). The problem that the Court faces is that there was no evidence to establish value at the time of the conversion. The only value the court has is the original purchase price of the truck. Without a way to calculate damages, there can be no award.

11. The fraud alleged in the cross complaint is without substance and is devoid of convincing evidence to prove the claim.

12. The main issue in this case is whether or not the defendant, based on the FACTS, gave its best and reasonable efforts to receive and sell the grapes provided to it in the early months of 2002. An additional issue is whether or not there was either a breach of contract by the cross-defendant/Plaintiff or a negligent misrepresentation. The latter issues include whether or not there was an overpayment by Heritage on the advances it paid to Exportadora.

13.  If the factual accusation against the defendant by the Plaintiff concerning the insurance claim (and the $15,000 paid on that claim) is related to any pled claim in the instant litigation, it is without merit.  The defendant did nothing wrong involving the subject matter of the claim of insurance.

14.  The testimony of Alejandro Barros about the misquotation of the email from Juan Pablo Munoz to John Akers on February 11, 2002 (JX 18) as it related to the email from Mr. Barros (DX 134-135), to wit: "It was a mistake" when he added the word "hoping" to the crucial language quoted is a SERIOUS CREDIBILITY BREACH.  In sum, the Court does not believe the witness.  Mr. Barros, in the email, recognized that the language in Ex. 18 was directive in nature, and his later misquote was nothing more than an attempt to rescind the directive.  The attempted rescission was too late, and the dishonesty of the witness was harmful to witness' credibility as a whole.

15.  The Pandol vs Heritage testimony concerning quality of grapes was of limited value UNTIL witness Barros testified that he believed that both entities were sent the same quality of fruit: "should, yes."  This, unlike the unlinked documents brought in by Shani Hibbard (DX 107-131), made the testimony of the problematic grapes sent to Pandol relevant, and lent corroboration to testimony that the conditions of the grapes shipped were of questionable quality, and certainly not all U.S. #1 rated.  This affected the ability to sell the grapes.

16.  The defendant was given ample notice of the arrival of the grape shipments.  In sum, the Court does not accept the proposition that the grapes just blindly arrived at the dock in Los Angeles.

17.  Due to the relative subjectivity among the "inspectors" (whether it be the USDA inspectors, those independent inspectors hired by the parties, or the inspections done by

7

the parties themselves), the tell-tale importance of the process was the inspections done by the buyers of the grapes (whether it be chains or other buyers). Indeed, "the buyer has the last word," and that last word is the important one. This has a direct link to the argument concerning the discrepancy and the confusion over the sales price and the adjusted price.

18. The oral and custom/practice terms of the consignment agreement between the parties were that the Defendant was to sell the grapes on a 7% commission and remit to the Plaintiff the net proceeds of sale after import fees, inspections, freight, storage and advances. The defendant claims that the $4 per box advance that was sent and received by the plaintiff resulted in the defendant's overpayment to the plaintiff of $22,000. The plaintiff denies this claim in light of poor marketing practices of the defendant, claiming that those practices were what caused the monies sent to the plaintiff to be so low. For the cross-complainant to meet the burden of proof, Heritage would have had to have substantiated their monetary claim by providing ALL of the figures on the numbers of boxes received, boxes sold, prices of each box sold, numbers and methods involved in the adjustments made on the sales, as well as the fees and costs of freight, storage and inspections. It did not do that.

19. While it is argued by the Plaintiff that the only basis to determine value of the discounted and/or dumped grapes is the average market price, this argument has a twofold premise:

    a) inspections were not "Timely" performed; and

    b) many of the grape shipments were SOLD at less than 50% of the
        market price.

    The Plaintiff's position on timeliness is that the definition of a timely inspection has been established by court precedent and should be used and followed by this Court. The inspection issue (whether there were inspections, and if there were, whether or not

1 they are timely) alone does not dictate the liability in the case at Bench. JX 18, and the
2 owner mandates therein, constitute the elephant in the living room that the Plaintiff
3 wishes the Court would either ignore or misinterpret.

4 The evidence is vague and inconclusive on the issue of the sales at less than 50%
5 of the market price. The Akers testimony at trial, uncontradicted, was that the SALES
6 price on the documents showing low figures ($5 and $2.50) were actually higher because
7 Mr. Akers would not have sold product for such low prices. He testified that the low
8 figures represented the "adjusted" prices. This means that once the goods were sold and
9 received by the buyer, the buyer complained of the condition of the grapes which resulted
10 in a downward adjustment from the sales price. There was no comment by either party
11 whether such a scenario altered the definition of the "sales price" as it pertains to the 50%
12 requirement. The Court can not be put into the position of having to speculate.

20. Plaintiff is a Chilean Corporation with principal offices in Santiago, Chile. Plaintiff is an exporter of table grapes from Chile to the United States.

21. Defendant is a California corporation and a dealer in perishable agricultural commodities based in Delano, California.

22. California Food and Agriculture Code section 56131 does not preclude application of the statute to foreign entities. In post-trial briefing, the plaintiff argues that the defendant delayed in raising the issue that this code section is inapplicable to this case. Even a delay does not give application to a statute that otherwise would have none. Nonetheless, the argument is moot in that this court disposes the substantive issue in favor of the plaintiff. The statute provides that police powers of the state are to be applied to protect the people of the state. If a foreign commodity is being sold in the state of California by a state resident such as Heritage, the statute has application. The defendant's reading of the statute is too narrow and restrictive

23. The defendant's position that the plaintiff's filing of an informal complaint before PACA was an election of remedies and thus should bar the instant suit is incorrect. "The election of remedies provision provided by statute appears to refer to the option to pursue either a lawsuit or the formal complaint process. It does not preclude the filing of a lawsuit should a complainant pursue the INFORMAL complaint process.

24. On the issue of untimely inspections, the plaintiff's summary citation in its brief to the holding that "When produce is received on consignment, the consignee has a duty to promptly and properly resell the product" (p. 10:8-9) is a correct one. On the other hand, the plaintiff's argument in its brief (p.10:14-15) that "The question as to whenever Heritage had product which arrived in condition suitable to be sold depends on the inspection certificates it obtained" is not entirely correct. The condition was the subject of other evidence, including the observations of witnesses and inferences involving Pandol-received products that has already been discussed above.

25. The facts in the instant case do not support the plaintiff's "timely inspection" argument. (7 U.S.C. section 499(b)).

26. Defendant's reliance on 7 USC section 499(f)(e) does not support the proposition that if a foreign company does not post the required bond under PACA, they are not provided the benefits and protections that PACA provides to residents of the United States. The defendant is confusing someone who is complaining (griping) with a complaint (pleading in a Federal Court).

**H. DECISION**

The Plaintiff, Exportadora, has failed to meet its burden of proof on either liability

or damages.  It is awarded nothing on its complaint.

The Cross-Defendant, Heritage, has failed to meet its burden of proof on damages. It is awarded nothing on its cross-complaint.

The vast majority of the discovery, the motions and the pleadings in this case involve BOTH the complaint and the cross-action.  Since neither side prevailed in their efforts at affirmative relief, each side is to bear its own costs and attorney fees.

IT IS SO ORDERED.

**Dated:   June 28, 2005**          **/s/ Lawrence J. O'Neill**
b9ed48                                                UNITED STATES MAGISTRATE JUDGE

11